# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | **CAPITAL CASE** |
| | ) | |
| v. | ) | No. 4:13CV2046 CEJ |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent, | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on petitioner's ex parte request under 18 U.S.C. § 3599(f) for authorization to retain a forensic psychiatrist to evaluate petitioner's decision-making capabilities and how they were affected by developmental trauma in his youth. For the following reasons, the request will be denied.

Petitioner was convicted by a jury of first-degree murder. Johnson v. State, 406 S.W.3d 892, 897 (Mo. banc 2013). The trial court adopted the jury's recommendation and sentenced him to death. Id. The evidence established that on July 5, 2005, police officers were in petitioner's neighborhood conducting an investigation. Id. Coincidentally, petitioner's younger brother suffered a seizure at his home and the police officers who were in the neighborhood were summoned to help. Id. The officers called for an ambulance, and additional officers were called to the scene. Id. Petitioner's brother was taken to the hospital, but he died a short time later due to a preexisting heart condition. Id. Later the same day, petitioner retrieved a handgun from his vehicle. Id. He told his friends that the officers were responsible for his brother's death. Id. While walking through the neighborhood, petitioner encountered one of the officers who had

responded to help his brother. As the officer sat in his patrol car, petitioner shot and killed him. Id. at 898.

Under 18 U.S.C. § 3599(f), the Court may authorize payments for expert services that "are reasonably necessary for the representation of [a capital habeas petitioner], whether in connection with issues relating to guilt or the sentence." At issue is whether the requested expert services are reasonably necessary for the presentation of petitioner's federal habeas claims.

Petitioner argues that both trial counsel and postconviction counsel failed to investigate or develop claims regarding his childhood trauma and its effects on his decision-making abilities at the time of the offense. Petitioner concedes that postconviction counsel presented the evidence of two psychologists who testified that petitioner suffered from acute stress disorder ("ASD") at the time of the murder. However, petitioner argues that the diagnosis of acute stress disorder did not take into consideration the effect of the abuse and privation petitioner suffered from for most of his life.

> Trial and post-conviction counsels' investigations were materially incomplete. For one thing, an acute stress disorder is just that: acute. The diagnosis, and the information provided to the evaluators, does not fully account for the long term effects of repeated traumatization in Mr. Johnson's early childhood years in the absence of the type of parental nurture and support that might have mitigated the impact of those stressors. Such stressors include ongoing physical abuse by numerous caregivers; abject neglect by a mother who failed to provide material support or adult supervision, and who left the family to live in rat-infested and otherwise unsanitary conditions; and abandonment not only by petitioner's mother, but also by his father, who spent the most of his son's childhood imprisoned for second-degree murder. This extremely lethal combination of repeated traumatization and the absence of parental nurture and support can have multiple serious impacts on the developing child, any one of which can render the individual vulnerable to distorted perceptions, hypervigilance, over-reactivity and generally poor decision-making. A qualified specialist must assess whether and how the known ongoing traumatic events impaired Mr. Johnson's development.

Ex Parte Mot. at 5 (citation omitted).

Petitioner claims that the current mitigation investigation has revealed new sources of developmental trauma that should be examined by a forensic psychiatrist. "These include petitioner's history of extensive sexual abuse at the hands of petitioner's cousins and others; continuous violence in the community; and ongoing institutional racism especially as between the Kirkwood Police Department and the residents of the Meacham Park neighborhood." Id. at 5-6. Petitioner also claims that he hears voices, which he regards as alter-egos, and that he heard those voices at the time of the murder.

Petitioner seeks to retain Richard G. Dudley, Jr., M.D., who lives and works in New York, for services in the amount of $44,550. Petitioner maintains that Dr. Dudley would require a total of 123 hours to interview petitioner, interview petitioner's close relatives and friends, review relevant records, consult with counsel, draft a report, and travel to and from New York.

Petitioner's trial counsel chose not to present a diminished-capacity defense. Johnson v. State, No. SC92448, Appellant's Br., 2012 WL 6825478 *57-58 (Oct. 29, 2012). "[C]ounsel's strategy was to present standing alone the facts of what they considered a compelling story about Kevin's reaction to his brother's death because everyone has experienced the death of a loved one." Id. In his amended postconviction motion, petitioner argued that trial counsel was ineffective for failing to investigate and present records showing that petitioner was suffering from ASD at the time of the murder and was therefore unable to deliberate. Id. at *58. Postconviction counsel further argued that trial counsel was ineffective for failing to present evidence of petitioner's childhood abuse during the penalty phase. Id. at *61.

Postconviction counsel presented the testimony of two psychologists, Dr. Levin and Dr. Cross. Id. at *39.

> Psychologist Daniel Levin testified in the post-conviction case to Kevin's history and mental functioning, based on his meeting with Kevin and his review of more

3

than 3,500 pages of Kevin's records from DFS; St. Louis County Family Court and Department of Mental Health; St. John's Hospital; several residential placements; and DOC; plus police reports, the trial transcript; Kevin's testimony, relevant statutes, and Levin's own report.

Id. at *2-3.

Dr. Cross also reviewed petitioner's records. Id. at 49. In addition, he "administered multiple tests – the Wechsler Adult Intelligence Scale (WAIS), the Wide Range Achievement Test (WRAT), the Minnesota Multiphasic Personality Inventory (MMPI), the Traumatic Stress Inventory (TSI), the Detailed Assessment of Post-Traumatic Stress (DAPS) (last 3), the Thematic Apperception Test (TAT), and the Rotter Incomplete Sentence Blank." Id. at 52. The tests showed that petitioner "had high levels of traumatic stress throughout his developmental years" and difficulty making decisions. Id.

Levin and Cross both testified at length that the abuse and privation petitioner suffered throughout most of his life led to ASD at the time of the murder. For example,

> Levin recounted that DFS became involved when [petitioner's mother] Jada was hotlined when Kevin was two years old. The family had severe financial stress - Kevin's father was in prison for murder, and Jada, one of nine children, was very young when she started having children. The initial report was about Jada going out and leaving her children unsupervised.
>
> Kevin's home conditions included a very cold home -- it had broken windows and no heat -- no cooking, refrigeration, or bathroom facilities, and electricity through an extension cord from [Jada's grandmother] Henrietta's house. Jada's felony probation for assault with a knife was significant because it showed she was already having problems when DFS entered her life.
>
> Jada's mother Patricia Ward reported concerns to DFS; Jada was often not home, and her whereabouts were often unknown. That pattern was repeated many times over the years of DFS involvement: workers found Kevin, age two, outside in December with a thin jacket and no socks, supervised only by an eight-to-nine-year-old child; Jada appeared unconcerned about her children, and did not take any action to dress them, instead sending them to find their own clothes and dress themselves for the cold.

4

Levin noted that in February, 1988 a Meacham Park Clinic social worker called DFS, also concerned about Jada's ability to parent Kevin and his siblings based on her observation that Jada was limited intellectually with an I.Q. of 70.

Jada took her AFDC check and left for long periods, then returned without any money, having spent it on drugs; the children were not being properly clothed and fed. When a DFS worker went to the home, she found it dirty and roach infested. Two fires in the home about a year apart strongly evidenced neglect.

Jada went into a drug program because her probation officer required it, but she did not complete it; the counselors noted her poor attitude on entry, and assessed her as chronically chemically dependent. It is significant to a child when a parent is addicted to crack, as was Jada -- it affects all aspects of one's ability to function as a parent; getting the drug is the sole preoccupation. Two days after leaving the program, Jada hit Kevin's brother Marcus near the eye with a shoe.

Observations of lack of supervision included: the children fighting, Kevin and his sister wearing dirty clothes, Jada leaving a hot iron in a room with several small children, and Kevin and another boy playing with a large running fan.

A DFS worker noted that the children "appear to suffer from environmental delays."

Levin recounted that DFS continuously got calls from family about Jada staying out all night or otherwise failing to supervise or otherwise care for the children. Life Skills reported that she left Kevin unsupervised in a park. Jada shouted at, threatened, and struck her children.

A Life Skills report in July indicated that Jada slapped her children on the head, arms and buttocks an average of three times per hour. Levin explained that it is never appropriate to hit a two-year-old in the head; a two-year-old child is completely dependent upon his parent for care and safety, and cannot defend himself against an adult physically. Such hitting, combined with the neglect Jada showed, only adds to the child's sense that the world is unsafe, and he cannot trust his parents to care for him.

One month after a drug rehabilitation stay, Jada was back to using drugs and left her children to get high.

October and November 1988 Life Skills summaries noted that Jada was again observed disciplining her children by hitting them. The November report also indicated that the instructor intervened twice to protect the children from Jada, only to have Kevin attempt to bite the instructor. An October hotline to DFS reported that Jada was continuing to abandon her children with her mother or grandmother. Jada was not just vanishing, but was taking Kevin with her for

hours at a time; she was using cocaine, prostituting herself, and was taking Kevin, who had just turned three, along with her.

Levin recounted that in December, 1988, a Meacham Park Clinic physician called the hotline because when Jada brought the children, they were filthy and smelled of urine, and Jada seemed disoriented. A risk assessment by DFS put Jada's children mostly in the high risk category, due to Jada's drug abuse and limited mental abilities.

A family member called DFS in December, 1988, and said Jada had received her AFDC $600 check, took Kevin with her while he was still in his pajamas, and did not return until 5:00 the next morning with only $100 left, having spent her money on drugs. Taking Kevin on drug runs at age three had negative psychological consequences on him.

In December, 1988, the children were found inappropriately dressed and dirty; Jada's behavior had not changed. Jada was arrested and incarcerated in December 1988. After her release in January 1989, there was another call to DFS about the lack of supervision of the children. Jada tested positive for cocaine in January.

The Court placed custody of Kevin's brother Marcus with Patricia Ward in April 1989, but Kevin and his sister remained with Jada.

In May 1989, Jada was staying out all night and using cocaine; she hit the children and was very short-tempered. Also in May, Jada took the children to a friend's house and abandoned them there without asking the friend. Jada was suspected of having stabbed a man who failed to deliver her drugs.

Patricia made a hotline call in July 1989; she was very concerned that the children were being exposed to drug use, and also to sexual behavior. The home was unacceptable -- there were rats and no unspoiled food. When asked where she had been until 3:30 a.m., Jada said she was in a motel with her boyfriend, "flat-backing."

Also in July, Jada abandoned the children with Patricia. A few days later, Patricia called DFS concerning a physical injury - she saw Kevin and Jada walking on the street late at night; Kevin had a large mark on his forehead, and when she asked him how he got hurt, he said his mother kicked him and knocked him down.

A response to a hotline call revealed no food in the home. Jada was using her food stamp money for cocaine. Jada's probation officer called DFS in August 1989 to report that Jada was mistreating Kevin in her office -- she reported Jada was yelling at him and hitting him. She was also seen slapping Kevin on the head and back at the health clinic in August.

> DFS placed Kevin at age four and a half with his great Aunt Edythe Richey. Edythe would hit Kevin for bedwetting. Levin noted at times Kevin acted out, but that was a manifestation of the neglect and abuse he endured.
>
> Levin recounted that Kevin's father was paroled from prison when Kevin was thirteen or fourteen and he beat Kevin. Kevin then spent time at St. Joseph's Boys' Home where he attempted suicide. From St. Joseph's, Kevin went to SouthPointe Psychiatric Hospital. At these facilities, Kevin did not get appropriate treatment.
>
> At SouthPointe Kevin displayed illogical, tangential disorganized thinking. Kevin was prescribed Ritalin for attention deficit disorder and the anti-depressant Imipramine. Kevin's DFS records reflected a diagnosis of Major Depression. Kevin's sister Kanesha's records reflected she was a diagnosed with bipolar disorder, and with crank, cannabis, and alcohol abuse, and ADHD.
>
> At ages fifteen through seventeen, Kevin returned to living with Edythe. A social worker at Catholic Charities found that Kevin lacked a sense of security and stability in his relationships with adults.
>
> When Levin saw Kevin prior to this offense, when Kevin was seventeen, he diagnosed Kevin as having an on-going type of depression referred to as dysthymia, and also adjustment disorder with mixed disturbance of emotions and child neglect.
>
> Levin's post-conviction evaluation found that at the time of the offense Kevin suffered from the mental disease or defect, Acute Stress Disorder. ASD develops in response to an extreme acute stress. To be diagnosed with this disorder, a person must have witnessed or have been confronted with an event that involved actual or threatened death or serious injury or a threat to the physical integrity of oneself or others and the person's response involved intense fear, helplessness, or horror. That happened to Kevin when he witnessed his twelve year old brother, Bam-Bam, die. Kevin felt both a sense of responsibility and horror for his brother's death.

Id. at *41-47 (citations to the record omitted).

Further investigation of petitioner's developmental trauma is not necessary as any such evidence would be merely cumulative. Contrary to petitioner's assertion, Drs. Levin and Cross concluded that petitioner's developmental trauma was the cause of his ASD at the time of the murder. As a result, the motion is denied.

Finally, § 3599(f) prohibits ex parte requests for expert services "unless a proper showing is made concerning the need for confidentiality." Petitioner argues that confidentiality is

7

necessary because the request reveals his litigation strategy. The Court disagrees. Petitioner is simply attempting to bolster a claim that was presented to the state courts. Confidentiality is not necessary, and the Court will order that the ex parte restrictions on the motion be lifted.

Accordingly,

**IT IS HEREBY ORDERED** that petitioner's ex parte motion to authorize expert expenses [ECF No. 31] is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall lift the ex parte restrictions on the motion and docket it appropriately.

Dated this 21st day of August, 2014.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE